RIDGEWAY *et al.* v. RIDGEWAY *et al.*

84   25<br>107   783

Where coadministrators join in procuring an order to sell land for distribution amongst the heirs, and one of them sells in presence of the other, but at a very low price, and immediately stipulates with the bidder to take the land for himself at an advance of $50.00, the bidder having neither paid the purchase money nor taken a conveyance, the transaction is virtually a purchase by the administrator at his own sale. If he goes forward and executes a deed to the bidder in which the coadministrator refuses to join, receives a check for the amount of the bid, returns the check (which thereupon is destroyed by the bidder), and takes a deed from the latter, paying the agreed $50.00, the land remains the property of the estate, both legally and equitably; and the two deeds ought to be cancelled as a fraudulent cloud upon the title, and the land be resold.

December 2, 1889.

Equity.   Administrators.   Sales.   Deeds.   Fraud. Title.   Before Judge HUTCHINS.   Oconee superior court. January term, 1889.

The heirs at law of Nelson Ridgeway, with the exception of John N. Ridgeway, by their petition to the su-

perior court, made the following allegations:   In 1855,
Nelson Ridgeway, of Clarke county, died intestate,
seized of a tract of land containing 300 acres, more or
less, lying in then Clarke now Oconee county, the
place where John N. Ridgeway now lives.   By consent
of all the heirs of deceased after his death, they then
all being of full age and *sui juris,* which consent was
entered ot record in the ordinary's office of Clarke
county, the widow of deceased was to occupy and pos-
sess said land during her life, which she did until her
death in 1887.   Letters of administration upon the es-
tate of Nelson Ridgeway were granted his two sons,
John N. and James M.; and after the death of their
mother, they applied to the ordinary of Clarke county
and obtained an order for the sale of the land.   After
this order was granted, John N., without consulting or
advising with his coadministrator, had the land adver-
tised for sale to take place in Watkinsville on the first
Tuesday in February, 1888.   James M., though not
advised by John N. as to the fact of the sale, heard of it
accidentally and was present on the day advertised for
the sale.   This was the first step on the part of John N.
in his scheme to have the land bought in for himself at
his own price.   John N., without consulting James M.
at all, procured one Camp to act as auctioneer; this
was fraudulently done by John N. in order to have the
land knocked off to a by-bidder procured by him for the
occasion, in the person of one Ware; for Camp, acting
as auctioneer, did not fairly and properly cry the first
bid submitted to him, which was from Ware, at $3 per
acre; for, after crying the bid of Ware only two or
three times, he knocked off the land to Ware, to the
great surprise and astonishment of everybody present.
The land was thus knocked off fraudulently to Ware at
the low price of $3 per acre when it was in fact worth
$9 per acre and when there were parties on the ground

willing to bid at least $8 per acre for it, had it not been knocked off before they knew it and had an opportunity to bid. This so-called sale was a fraud and a trick resorted to by John N. to buy the land in for himself. Ware was only a by-bidder procured by John N. for that purpose, for, after the land was knocked off to Ware, he publicly announced on the ground that he had agreed to let John N. have the land. James M. who was present, when he saw the fraud that was being practiced by John N., publicly pronounced the so-called sale a fraud, and notified Ware that he (James M.) would not unite in any administrator's deed to him for the land. Petitioners allege that the sale was fraudulent, null and void. They are not informed whether John N. has made any deed to Ware, but if he has, it is a fraudulent one and as against their rights null and void, and should be so declared. They pray that the sale to Ware be declared null and void and a re-sale of the land be ordered by the court ; that any deed from John N. to Ware be annulled and cancelled ; and for general relief, process, etc.

They amended their petition and charged, that on the——of——, 1888, John N., as administrator, made a deed to Ware, and immediately on the same day, Ware reconveyed the land to John N., which was the consummation of the fraud set forth in the original petition ; and they pray that the two deeds may be delivered up to be cancelled, and the land be decreed to be re-sold and the proceeds of the sale divided among the heirs of Nelson Ridgeway in the terms of the law.

The defendants answered, denying all allegations of fraud, claiming that Ware bought in good faith and sold the land for a profit to John N.; that James M. recognized the sale as valid, and offered to buy the land from Ware and pay him a profit, and insisted on the trade, never complaining of the sale until after Ware refused

to sell to him; that John N. had no idea that Ware would buy the land, had never spoken to Ware on the subject nor authorized any one else to do so; that J. M. was present when the order for sale was granted and went with John N. to get the order; that it was agreed between them that the land should be sold on the first Tuesday in Febuary, 1887; and that John N. was to attend to the business of winding up the estate, for the reason that J. M. lived some distance off in the county of Cobb; that there was no collusion between John N. and any one; that the land was cried for at least ten minutes; that Ware said publicly to the auctioneer not to knock it down to him, at one time, but to continue to cry the property, which the auctioneer did, etc.

Upon the trial, the evidence introduced by plaintiffs tended to show the following: Nelson Ridgeway died in 1854; plaintiffs and John N. Ridgeway are his heirs at law; J. M. and J. N. Ridgeway were the administrators of Nelson Ridgeway; J. M. and John N. went to the ordinary of Clarke county in December, 1886, and got an order for the sale of the land. When J. M. returned home, there was no understanding between them as to when the land was to be sold. J. N. had it advertised in the Athens paper, and did not advertise it in the Oconee.county paper. Having accidentally found notice of the sale in the Athens paper, J. M. came down and was present the first Tuesday in February, 1887, at the sale. John N. did not even speak to him nor have one word to say to him about the management of the sale, but the first thing J. M. knew about it was when Camp was crying Ware's bid. Camp was a neighbor of John N. and was not an auctioneer. He read the advertisement and cried the land three times, and Ware bought it at $3 per acre, when it was worth $8 or $10 per acre. There were parties present who would have given more for the land but did not have time to bid. J. M.

himself, at the time of the sale, was talking to one Thomas and told him to bid $4 per acre, and while they were talking about it and before the bid was made, the land was sold to Ware. ˙ It was J. M. who testified that Camp only cried Ware's bid three times. Thomas testified that he did not know how long Camp cried the bid but that it was not very long. J. M. testified that there were several parties who would have given $8 per acre for the land who did not have time to bid; afterwards testified that he did not know of anybody else who desired to bid for the land that day; and afterwards testified that there were present persons who would have given more for the land than it brought. J. M. Ridgeway further testified that he did not see John N. speak to Ware before or during the sale, but directly after the sale saw Ware wink at John. N.; they then got together and Ware made the deed to John N. He (J. M.) had a talk with Ware about 20 minutes after the sale; did not offer Ware a $100 profit, but asked Ware if he would take $100 profit, but Ware said he had agreed to let John N. have it. After Ware had made this statement to J. M., the latter openly stated in the hearing of the crowd that the sale was a fraud, and that he did not mean to abide by it but would contest the matter in the courts; Ware then said if the heirs would get together and agree among themselves, he would make the deed to whoever they said, but John N. said no. J. M. knew nothing about the making of the deed; had nothing to do with it; was not asked to sign the deed, and did not know until the time of the trial that a deed was ever signed at all.

The testimony introduced by defendants tended to show as follows: J. M. and John N. went together and obtained an order for sale. It was too late to obtain an order to sell in January, and they could not sell earlier than the first Tuesday in February. They agreed that

they would obtain the order and then advertise a sale
as soon as possible.  With that understanding, J. M.
went home, and as soon as an order was obtained, John
N. advertised the land to be sold on the first Tuesday
in February at Watkinsville.  The administration was
in Clarke county, Oconee having been cut off from
Clarke.  It was agreed between the administrators that
John N. being in Oconee, should attend to the whole
matter.  Before the day of sale, John N. spoke to
Camp, who was not an auctioneer but who John N.
knew had been a bailiff and was accustomed to such
work, to go down and sell the land.  There was no
collusive arrangement between John N. and Camp
whatever.  On the day of sale, John N. went to Wat-
kinsville and found J. M. and a number of heirs at law
there.  He heard no complaint.  He put up the land,
after reading the advertisement, and announced the
terms of sale and told Camp to sell it.  Camp cried the
land for sometime and nobody bid.  After a while Ware
came up and Camp called to him to give him a bid to start
the sale, whereupon Ware made the only bid that was
made.  There was no collusion or agreement between
John N. and Ware ; in fact, they were unfriendly and
hardly on speaking terms.  Camp cried Ware's bid for
sometime, several minutes ; started to knock the land
off to Ware, and Ware asked him to continue to cry it,
which he did ; and it was finally knocked off to Ware.
Ware did not want the land, though it sold cheap, as
he had other use for his money.  The land was worth
$5 or $6 per acre.  Land usually sells cheap at public
sale.  After the sale, John N., having heard Ware say
during the sale that he did not want the land, carried
Ware to one side and told him that he would take the land
off Ware's hands.  Ware agreed to allow him to take it
for $50 advance, and John N. agreed to give it.  He
went to an office and John N. made Ware a deed, Ware

giving John N. a check on a bank for $900, and then Ware made John N. a deed and John N. gave him the check and $50 besides and Ware destroyed the check. John N. had not seen Ware to talk to him and had had no conversation with him for several years until after the sale took place; they had had some trouble and did not have any dealings whatever. Ware had no expectation of buying the land, but made a bid simply to start the bidding. After the land was knocked off to Ware and after he had agreed to let John N. have it at $50 advance as above stated, J. M. asked Ware if he would take $100 for his bid, but he told J. M. what he had said to John N. and that therefore he could not let J. M. have the land, but if all the heirs would agree among themselves about the matter he would make a deed as they might desire. Ware knew that he had a bargain in the land, but after the sale was made, heard J. M. making some threats from which he was afraid there might be a lawsuit growing out of it, and hence he was willing to sell at less profit than he would perhaps otherwise. Camp cried the land a sufficient length of time for anybody to bid that wanted to, as long as is common in such cases, and conducted the sale, as an auctioneer, in a proper manner. Administrators often get persons other than auctioneers to sell for them; they seldom employ an auctioneer. J. M. gave notice that he would not sign the deed, and Ware simply took John N's deed; as he was going to deed the land to John N., he did not care whether J. M. signed it or not. John N. has never settled with the heirs nor made any return of the sale, and he never has paid anything to any of the heirs; they have never called for it; and he has had use of the land ever since the sale. (The trial occurred on January 31, 1889.) The land has been given in at $5 per acre several years.

The jury found that the two deeds in question be de-

livered up and cancelled, and that a new sale of the property be ordered by administrators; and defendant moved for a new trial on the ground that the verdict was contrary to law, evidence, the principles of equity and the charge of the court. The motion was overruled, and defendant excepted.

THOMAS & STRICKLAND, for plaintiffs in error.

J. P. BROOKE, H. C. TUCK, A. P. HENLEY and A. J. COBB, *contra.*

BLECKLEY, Chief Justice.

The facts are minutely set forth in the official report. There were two administrators, and they had joined in procuring an order for a sale. One of them caused the land to be sold in the presence of the other. It was bid off by a third person (Ware) for about half its value. He was immediately offered by the selling administrator fifty dollars for his bid, and at once agreed to take it. When this bargain was made, Ware had not acquired title to this land; it still belonged to the estate. He had neither paid for it, nor taken a conveyance. The transaction, therefore, was not essentially different from a purchase by an administrator at his own sale. The administrator did purchase before the sale was consummated. He raised Ware's bid fifty dollars, giving Ware the benefit of the advance instead of giving it to the estate. It would have been better for the estate if he had bought directly from himself rather than through Ware. What followed between them, except as to the fifty dollars, was an empty formality colored with ink for the purpose of investing the administrator with the appearance of a paper title. He conveyed to Ware, who gave him a check upon a bank for the amount of the bid; then Ware conveyed back to him, took up the check, destroyed it and received fifty dollars, which was the only money really passed between the parties.

The administrator made no return of the transaction, and has never made any payment for the land to anybody, except the fifty dollars to Ware for the privilege of taking the benefit of his bid. The coadministrator refused to join in any conveyance, and for that reason full legal title was not passed. 2 Am. Law of Administration, by Woerner, 1068; Wasson v. King, 2 Dev. & Bat. Law, 262; McRae v. Farrow, 4 Hen. & Munf. 444; Halbert v. Grant, 4 Monr. 581 After long acquiescence on the part of the heirs at law, the deed of one administrator to another has been upheld as title. Newton v. Beckom, 33 Ga. 163. Here the heirs declined to acquiesce, and filed their complaint within less than six months after the defective sale. The land, therefore, remained both legally and equitably the property of the estate to which it previously belonged, and these deeds, the first from one of the administrators to Ware, the second from Ware back to him, were mere clouds upon the real title.

The outward and visible circumstances of the transaction went strongly to establish the whole case of fraud set up by the complaint. The code, §2751, says that fraud being in its nature subtle, slight circumstances may be sufficient to establish it. Here the circumstances were more than slight. The jury considered them sufficient. It is possible that the combination prior to the sale, between the administrator and auctioneer, and between the administrator and bidder, which is alleged in the complaint, may not have existed. Whether it existed or not, the deeds ought to be set aside. In *Alexander* v. *Alexander*, 46 *Ga.* 290, Judge McCay says, "The purchase by the trustee is *prima facie* a fraud, and however the formal legal title may be, he holds the property as trustee under the implied understanding which the law casts upon him." And see *Willis* v. *Foster* 65 *Ga.* 82. If there was no fraudulent

v 84-3

combination prior to the sale, the result, legal and equitable, flowing from the other facts of the case, would be the same, and so enough was proved to warrant the verdict. *Judgment affirmed.*